MCGREGOR W. SCOTT
United States Attorney
GRANT B. RABENN
PAUL A. HEMASATH
KEVIN C. KHASIGIAN
Assistant U. S. Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

KENNETH A. BLANCO
Acting Assistant Attorney General
Criminal Division, United States Justice Department
LOUISA K. MARION
Trial Attorney
Computer Crime and Intellectual Property Section
Washington, DC 20530
Telephone: (202) 514-1026

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ALL MONIES, FUNDS, AND CREDITS ON DEPOSIT AT LOYAL BANK LIMITED IN SAINT VINCENT AND THE GRENADINES, HELD IN THE NAMES OF ACE GUIDE HOLDINGS LIMITED AND/OR ALEXANDRE CAZES AKA ALEXANDER CAZES, INCLUDING BUT NOT LIMITED TO ACCOUNT 104013156705840, CUSTOMER ID: 90528529,<br><br>ALL MONIES, FUNDS, AND CREDITS ON DEPOSIT AT SIAM COMMERCIAL BANK IN THAILAND, HELD IN THE NAME OF ALEXANDRE CAZES, INCLUDING BUT NOT LIMITED TO ACCOUNT 407-9-15834-7,<br><br>CHECK IN THE AMOUNT OF $12,250.00,<br><br>CHECK IN THE AMOUNT OF $65,000.00, and<br><br>CHECK IN THE AMOUNT OF $51,910.00.<br><br>Defendants. | VERIFIED COMPLAINT FOR FORFEITURE *IN REM* |

The United States of America, by and through its attorney, McGregor W. Scott, United States Attorney for the Eastern District of California, for its verified complaint alleges, upon information and belief, as follows:

**JURISDICTION AND VENUE**

1. This action is brought by the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), seeking the forfeiture of all the assets involved in, and traceable to, the ownership and operation of the AlphaBay illegal marketplace by ALEXANDRE CAZES ("CAZES"), including the following:

   a. All Monies, Funds, and Credits on Deposit at Loyal Bank Limited In Saint Vincent And The Grenadines, Held In The Names Of Ace Guide Holdings Limited And/Or Alexandre Cazes aka Alexander Cazes, Including But Not Limited To Account 104013156705840, Customer ID: 90528529 ("the Defendant Loyal Bank Account");

   b. All Monies, Funds, and Credits on Deposit at Siam Commercial Bank In Thailand, Held In The Name Of Alexandre Cazes, Including But Not Limited To Account 407-9-15834-7 ("the Defendant Siam Bank Account");

   c. Check in the Amount of $12,250.00, ("the Defendant $12,250.00");

   d. Check in the Amount of $65,000.00, ("the Defendant $65,000.00"); and

   e. Check in the Amount of $51,910.00, ("the Defendant $51,910.00").

2. This Court has jurisdiction over this action pursuant to Title 28, United States Code, Sections 1355(a), (b)(1) and (b)(2), and Title 18, United States Code, Section 981.

3. Venue is proper pursuant to Title 28, United States Code, Sections 1355(b)(2) and 1395(a), and Title 18, United States Code, Section 981(h).

**FACTUAL OVERVIEW**

4. As detailed below, from December 2014, up to and including July 2017, the AlphaBay hidden website served as a marketplace for illegal goods—selling malware, controlled substances, chemicals, guns, stolen financial information and counterfeit documents to its users located all over the world. AlphaBay was the largest dark web market and its annual sales were estimated to be in the hundreds of millions of dollars. The AlphaBay website was designed to facilitate the illicit commerce hosted on the site by providing anonymity to its users, in two primary ways. First, the AlphaBay hidden website operated on the dark web accessible only through The Onion Router ("TOR") network, a special network of computers on the Internet designed to conceal the true IP addresses of the computers on the

network.  Second, AlphaBay required its users to transact in cryptocurrencies, also referred to as digital currencies, such as Bitcoin.

5. An individual named ALEXANDRE CAZES, a/k/a "Alpha02," a/k/a "Admin," founded AlphaBay in 2014 and was its leader through July 4, 2017.  CAZES, as the founder, oversaw AlphaBay's operations since its inception and has controlled the massive profits generated from the operation of the business, collecting tens of millions of dollars in commissions from the illegal transactions facilitated by AlphaBay.  CAZES has always been aware of the illegal nature of his enterprise—in 2014 he posted in the "About Me" section of AlphaBay that the site was "launched in September 2014 and its goal is to become the largest eBay-style underworld marketplace."

6. AlphaBay was modeled after conventional e-commerce websites.  In exchange for a vendor fee, users could establish vendor profiles and offer goods for sale online.  These vendor pages were visible to buyers and often listed introductory information the vendor chooses to post in addition to his/her online moniker, as well as the vendor's product listings and reviews from previous customers.  In June 2017, there were approximately 369,000 listings for the sale of various categories of illicit goods on the AlphaBay website, including such hosted categories as "Fraud," "Drugs & Chemicals," and "Counterfeit items."

7. During its operation, AlphaBay charged a commission for every transaction conducted by its users.  The commission rate varied based on the seller's history, volume, and trust level on the site, but generally varied from 2-4%.  AlphaBay also offered a referral program whereby a user received a portion of the commission earned from users referred to the site, thereby encouraging existing users to introduce new users to the site and increase the sales volume.  In addition, AlphaBay kept the value of Bitcoin or other cryptocurrency left behind by users who were banned from the site or otherwise abandoned their AlphaBay accounts.

8. AlphaBay only allowed its users to transact in digital currencies, such as Bitcoin, Monero and Ethereum, but Bitcoin was the preferred digital currency for AlphaBay users.  Instead of being issued by a government, bank, or company, digital currency is generated and controlled through computer software operating on a decentralized peer-to-peer network.  Bitcoin payments are recorded on a public ledger that is maintained by peer-to-peer verification, known as the "Blockchain."

Verified Complaint for Forfeiture *In Rem*

Accordingly, no single administrator or entity controls the verification of Bitcoin transactions, unlike say a bank, which clears financial transactions for customers.

9. Bitcoins are stored on digital "wallets," which essentially store the access code (known as a "private key") that allows individuals to conduct Bitcoin transactions on the Blockchain. Even though the public addresses associated with Bitcoin transactions are recorded on the Blockchain, the true identities of the transactors are not recorded. If, however, a real individual or entity is linked to a public address, it would be possible to determine what transactions were conducted by the individual or entity controlling that public address. Bitcoin transactions are, therefore, not entirely anonymous.

10. Transactions on AlphaBay occurred through cryptocurrencies hosted and controlled by the site. To purchase illegal goods and services, users transferred funds into the site's cryptocurrency addresses, where the funds were held in escrow until the transactions were completed. After a transaction was completed, and AlphaBay took its approximate 2-4 percent cut, users could send their cryptocurrencies to private addresses not controlled by the site. Because cryptocurrency transactions can in theory be traced (e.g., through the Blockchain), "tumblers" and "mixers" could be used to obscure the historical trail of the cryptocurrencies' movements. Mixers and tumblers obscure transaction histories by combining, splitting and re-combining Bitcoins through a series of wallets controlled by the tumbler or mixer. According to postings on AlphaBay, the site introduced a tumbler in approximately April 2016.

11. Between May of 2016 and when the site was taken down, law enforcement agents participating in this investigation made numerous undercover purchases of controlled substances (marijuana, heroin, fentanyl, and methamphetamine), fake identification documents and an ATM skimmer from AlphaBay vendors, including purchases made from, and substances and other illegal items shipped to, the Eastern District of California. Samples of the controlled substances purchases have been laboratory-tested and have typically shown high purity levels of the drug the item was advertised to be on the AlphaBay website. Based on the postal markings on the packages in which the drugs and illegal items arrived, these purchases appear to have been filled by vendors located across the country—the investigation has also revealed cocaine and marijuana AlphaBay vendors residing in the Eastern District of California.

## ALEXANDRE CAZES: ALPHABAY'S FOUNDER AND OPERATOR

12. In the course of this investigation, law enforcement agents identified CAZES as "Alpha02" and "Admin," the founder and administrator of AlphaBay. According to AlphaBay's FAQs, "AlphaBay Market . . . [was] founded by alpha02, reputable member on most carding forums … [a]fter some time helping others on carding forums, he decided to start his own marketplace and allow sellers from around the world to sell goods to buyers worldwide." Early pages of the AlphaBay site listed a "copyright" mark indicating that the site was "proudly designed by Alpha02."

13. From the site's launch in December 2014 through August 2015, Alpha02's public profile on AlphaBay listed him as "Administrator & Owner" of the site. It also stated that "Alpha02" joined the site on July 14, 2014, which pre-dated the public launch of the website by approximately six months. Alpha02's profile signature block also indicated that he accepted "private messages from staff only." Until August 2015, Alpha02 was also a prolific author of posts on the AlphaBay forums and his posts were tagged with the "administrator" designation, indicating that Alpha02 had site ownership privileges.

14. In August 2015, the username for the AlphaBay administrator account changed from "Alpha02" to "Admin." Around the same time, Alpha02 posted a message on the AlphaBay forum stating, "alpha02 account will be renamed to 'Admin'. This account will ONLY accept private messages from Staff." The AlphaBay profile for Admin at the time of the takedown showed that it was the same account previously labeled "Alpha02" and that the moniker was simply changed. Admin has been a member since July 27, 2014, and as described below, evidence located at the time of CAZES' arrest confirmed that CAZES continued using the Admin profile after August 2015.

15. In December 2016, law enforcement learned that CAZES' personal email was included in the header of AlphaBay's "welcome email" to new users in December 2014. Specifically, soon after AlphaBay was launched, the site established an associated online forum allowing customers and vendors to discuss their business. One feature of the sign-up process was new users had to provide an email address for password recovery in case the user lost his/her password. Once new users joined the forums and entered their private email accounts, they were greeted with an email directly from AlphaBay welcoming them to the forums. The email address of "Pimp_Alex_91@hotmail.com" was included in the header information of the AlphaBay welcome email.

16. Law enforcement subsequently learned the "Pimp_Alex_91@hotmail.com" email address belonged to a Canadian man named Alexandre CAZES with a birthdate of October 19, 1991, matching the numeric identifier in his Hotmail email address. CAZES was a self-described independent website designer affiliated with a company called EBX Technologies ("EBX Tech"). Law enforcement reviewed the LinkedIn profile for "Alexandre Cazes," which identified CAZES as an employee for EBX Tech with the notable IT skills and coding proficiencies. EBX Technologies claims to provide web design services, but its website does not appear to support any substantial business operations. A review of EBX Tech's current bank records show little to no business income or banking activity. In the years before his arrest, CAZES maintained several bank accounts in the name of "EBX Technologies" and used these "business" bank accounts to create digital exchange accounts so he could liquidate and manage his cryptocurrency.

17. Law enforcement uncovered additional facts indicating that CAZES was "Alpha02," including financial transaction information linking CAZES to AlphaBay and financial records indicating that CAZES had many millions of dollars' worth of investments throughout the world without any lawful source. Additionally, CAZES was logged into the AlphaBay website as "Admin" on July 5, 2017 when law enforcement searched his residence, and was in active communication with one of the AlphaBay data centers about a law enforcement-created service outage on the site. Finally, passwords to AlphaBay's servers and other infrastructure were found on CAZES' personal computer at his residence, as described below.

**JULY 5th ARREST AND SEARCH IN THAILAND**

18. On July 5, 2017, the Royal Thai Police executed an arrest warrant for Alexandre CAZES, as well as a search warrant, with assistance from the FBI and DEA, at his primary residence in Bangkok, Thailand. At the time of his arrest, law enforcement discovered CAZES' laptop open and in an unencrypted state. The laptop was in CAZES' bedroom and logged into the server that hosted the AlphaBay website—CAZES was logged in under the username "Admin" and had accessed the data center hosting the AlphaBay site in order to execute a reboot command after AlphaBay went offline as a result of a law enforcement-created service outage. In addition to being logged into the AlphaBay server as "Admin," CAZES' computer was also logged into the AlphaBay forums as "Admin," replying

6
Verified Complaint for Forfeiture *In Rem*

to comments from AlphaBay users.

19. With the computer unlocked and unencrypted, law enforcement searched CAZES' computer and found several open text files that identified the passwords/passkeys for the AlphaBay website, all of the AlphaBay servers, and other online identities associated with AlphaBay. Law enforcement also discovered a file on CAZES' computer that identified the value and location of CAZES' assets obtained from AlphaBay. The document was modeled after a personal financial statement—listing "TOTAL NET WORTH" in bold at the top of the document. Below the net worth heading, CAZES broke down his "holdings" into various subcategories such as ""Asset holdings," "Cash holdings," as well as by each distinct cryptocurrency and method of storage. According to his financial statement, CAZES had a net worth of $23,033,975.

20. Under the "Assets" heading of the document, CAZES identified ten vehicles and real properties that he valued at more than $12.5 million. CAZES identified several real estate holdings in Thailand, including the residence searched by law enforcement and the adjacent villa he purchased for his in-laws. CAZES also identified a vacation property he purchased in Phuket, Thailand, ("Villa Torcello") and a new home being built in Granada Pinklao-Phetkasem in Bangkok, Thailand (the "Granada Residence"), as well as luxury foreign properties in Antigua and Cyprus, the latter where he was attempting to obtain economic citizenship by purchasing expensive real property in the country.

21. The "Assets" portion of CAZES' document also identified the luxury vehicles he purchased and drove in Thailand. CAZES identified a "Lambo," meaning a Lamborghini, which he purchased for over $900,000, a "Mini" Cooper his wife used valued at $81,000, and a BMW motorcycle worth $21,000.[1] CAZES identified a fourth luxury vehicle worth $292,957, which corresponds to his

---

[1] At least one of the vehicles identified on CAZES' financial document was registered in his wife's name. CAZES' wife is a self-described researcher at an academic institution, but the investigation has revealed CAZES's wife's bank and digital currency accounts were involved in the transfer and maintenance of millions of dollars in criminal proceeds from AlphaBay. At this time, law enforcement have not identified a legitimate source for the assets obtained by CAZES and his wife, including any assets held in CAZES' wife's name. However, the investigation has revealed that between May 2015 and February 2017, Bitcoin addresses associated with AlphaBay conducted approximately 4,023,480 transactions, receiving approximately 839,087 Bitcoin and sending approximately 838,976 Bitcoin. This equals approximately US$450 million in deposits to AlphaBay. CAZES's 2-4% commission on Bitcoin transactions likely conducted with those funds would equal between $9-18 million, which is consistent with the conclusion that his income derived from AlphaBay.

7

online forum posts about his acquisition of a Porsche Panamera in or about May 2016. Law enforcement observed CAZES driving the Porsche in Thailand, the Porsche was registered in his name in Thailand, and the vehicle was parked at his primary residence on July 5, 2017.

22. CAZES' financial statement next identified cash holdings of over $770,000 and $6.5 million in cryptocurrency. Similar to the bank abbreviations, CAZES abbreviated his cryptocurrency holdings—"BTC" for Bitcoin, "ETH" for Ethereum, "XMR" for Monero, and "ZEC" for Zcash—and identified the corresponding wallet addresses. Written next to these wallet addresses were the "private keys" that allowed law enforcement to unlock the controls and move the cryptocurrency within each wallet address to a secure government-controlled address.

23. CAZES' financial statement also identified "Banks" and categorized his bank holdings by the first initial of each Thai financial institution: "K" for "Kasikorn Bank," "B" for "Bangkok Bank," and "S" for "Siam Bank." Each abbreviation identified a balance that matched law enforcement's analysis of CAZES' bank holdings in Thailand. Written below the Thai bank accounts and balances were CAZES' foreign bank accounts, including an account in Switzerland containing $781,000 and several accounts at Loyal Bank Limited, a private offshore bank located in St. Vincent and the Grenadines.

24. Cazes's personal financial statement also identified "Banks" and categorized his bank holdings by the first initial of each Thai financial institution. For example, "K" meant "Kasikorn Bank," "B" meant "Bangkok Bank," and "S" meant "Siam Bank." Each abbreviation identified a balance that matched the information obtained by law enforcement authorities regarding Cazes's bank holdings in Thailand, including the Defendant Siam Bank Account. Law enforcement has since connected funds in the Defendant Siam Bank Account to transfers made by Cazes from bank accounts linked to digital currency holdings originating from AlphaBay.

25. Law enforcement agents seized from CAZES' computer documents showing his involvement with the opening of a bank account at Loyal Bank Limited for a company named "Brilliant Landmark Concept Limited." In a document titled, "Resolution of Board of Directors of Brilliant Landmark Concept Limited" an "attorney-in-fact" authorizes "the Company" to open a bank account at Loyal Bank Limited in the country of Saint Vincent and the Grenadines. CAZES is identified as "the

Company" and sole authorized user of the bank account at Loyal Bank. The document is dated February 15, 2017 and identifies a corporate address in Wan Chai, Hong Kong.

26. Law enforcement agents obtained additional bank statements corresponding to a second CAZES-controlled bank account at Loyal Bank Limited for a company named "Ace Guide Holdings Limited." In the statement, Ace Guide Holdings Limited has the same corporate address as Brilliant Landmark Concept Limited, another CAZES shell entity. The statement identifies a June 2017 payment of over $30,000 and a balance exceeding $114,000.

27. Additionally, in email communications obtained by law enforcement, CAZES described his money-laundering scheme to certain property brokers, explaining that his true net worth was "invisible" because he had created shell companies to own luxury properties and receive rental proceeds. These shell companies included Ace Guide Holdings, Ltd., which he created to purchase and receive rental receipts from Villa Torcello, Brilliant Landmark Concept Limited, which he created to purchase the Granada Residence in Bangkok, Thailand, and KGYJ Management Limited, which he created to purchase property in the country of Grenada.

**ECONOMIC CITIZENSHIP APPLICATIONS**

28. As explained above, CAZES had successfully obtained economic citizenship in at least one country and was in the process of obtaining economic citizenship in several other foreign countries. The first, in Antigua, involved CAZES completing a citizenship application for Antigua and wiring $400,000 from his account at Bangkok Bank to purchase Villa 302 at Nonsuch Bay Condominiums in St. Phillip's South, Antigua. The Antiguan government identifies Nonsuch Bay Condominiums, a resort community on the East coast of the Island of Antigua in the Caribbean Sea, as a real estate project qualifying for citizenship by investment. In exchange for his $400,000 investment, CAZES and his wife were issued Antiguan passports in February 2017.

29. In April 2017, CAZES mailed a package from Bangkok to Bank Alpinum AG in Liechtenstein that was intercepted by law enforcement. The package contained a contract and related instructions for the transfer of €3 million to Bank Alpinum AG in Liechtenstein, as well as documents indicating a €2.38 million transfer from CAZES to USB Cyprus for the purchase of a villa in that country. Cyprus allows for the purchase of citizenship with a direct investment of at least €2 million for

the acquisition or development of real estate and law enforcement confirmed that CAZES completed the acquisition of a villa in Cyprus for the purposes of economic citizenship.  The villa is located in the Sea Pearl Residences in Paralimni Famagusta, Cyprus and was purchased by CAZES using AlphaBay proceeds.

30. A review of CAZES' computer files and financial records, as well as interviewing witnesses with knowledge of CAZES' foreign investment plans, revealed that CAZES was also in the process of obtaining citizenship in the countries of Grenada, St. Kitts and Nevis, and others.  In Grenada, an island country in the West Indies in the southeastern Caribbean Sea, CAZES had completed the country's application for citizenship by investment and pre-selected a condominium at a resort in the Kawana Bay part of the island.  CAZES' pre-selection required a deposit—"the Defendant $12,250.00"—which then permitted CAZES to include the condominium to support his application to the Grenadian government.  CAZES made the deposit using criminal proceeds from AlphaBay.

31. CAZES had also pre-selected and paid a deposit to support his application for economic citizenship in the country of St. Kitts and Nevis.  In St. Kitts and Nevis, also an island country in the West Indies, CAZES had applied for citizenship by investment and pre-selected a plot of land designated for future development, which qualified under the country's economic citizenship program.  The plot of land was located in the Christophe Harbour and CAZES had deposited the sum of $65,000 to hold the land—"the Defendant $65,000.00."  CAZES made the deposit of $65,000 using criminal proceeds from AlphaBay.

32. CAZES had retained the services of a travel and economic consultant to assist him with the multiple economic citizenship applications for he and his wife.  CAZES had paid the consultant a large retainer to navigate and complete the various citizenship applications and, in July 2017, approximately $51,910 remained unspent—"the Defendant $51,910.00."  CAZES made the retainer payment using criminal proceeds from AlphaBay.

**FIRST CLAIM FOR RELIEF**
**18 U.S.C. § 981 (a)(1)(A)**

33. Paragraphs one to thirty-two above are incorporated by reference as though fully set forth herein.

34. The defendant assets are subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A), because they were involved in violations of Title 18, United States Code, Section 1956(h), which makes it an offense to conspire to commit money laundering, specifically, in violation of sections 1956(a)(1)(B)(i) and 1957 of Title 18, United States Code.

35. Pursuant to Title 18, United States Code, Section 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction in violation of 1956 or 1960 … of [Title 18], or any property traceable to such property," is subject to forfeiture.

36. Pursuant to Title 18, United States Code, Section 1956, commonly known as the "money laundering" statute, a person who:

> (a) (1) … knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
>
> (A)   (i)   with the intent to promote the carrying on of specified unlawful activity; or
>
> (ii)   with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or
>
> (B)   knowing that the transaction is designed in whole or in part—
>
> (i)   to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
>
> (ii)   to avoid a transaction reporting requirement under State or Federal law,
>
> shall be guilty of a crime.

37. Title 18, United States Code, Section 1956(h) further provides that "[a]ny person who conspires to commit any offense defined in this section [1956] or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." For purposes of Section 1956, "specified unlawful activity" includes, among other things, violations of federal drug laws, Title 21, United States Code, Section 841(a)(1). Title 18, United States Code, Section 1957 provides that a person commits a crime when s/he "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is

11

derived from specified unlawful activity."

38. By reason of the above, the defendant assets are subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A).

**SECOND CLAIM FOR RELIEF**
**18 U.S.C. § 981 (a)(1)(C)**

39. Paragraphs one to thirty-two above are incorporated by reference as though fully set forth herein.

40. The defendant assets are subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C), because they represent criminal proceeds, or property traceable thereto, of violations of Title 18, United States Code, Section 1962, which makes it an offense to be associated with any enterprise that conducts racketeering activity, Title 18, United States Code, Sections 1028(f) and 1029(b)(2), conspiracy to commit identity theft and access device fraud, Title 18, United States Code, Sections 1028(a)(2), (b)(1)(A)(ii), & (f), unlawful transfer of a false identification document, Title 18, United States Code, Sections 1029(a)(4), (b)(1), and (c)(1)(A)(ii), trafficking in device making equipment, and 21 U.S.C. §§ 841, violations of the Controlled Substances Act.

41. Pursuant to Title 18, United States Code, Section 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation" of any offense constituting "specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense" shall be forfeitable to the United States.

42. Pursuant to Title 18, United States Code, Section 1956(c)(7), the term "specified unlawful activity" means "any act or activity constituting an offense listed in section 1961(1) of this title."

43. Pursuant to Title 18, United States Code, Sections 1961(1) and (5), the term "racketeering activity" includes violations of 18 U.S.C. § 1028 (fraud in connection with identification documents), 18 U.S.C. § 1029 (fraud in connection with access devices), and 18 U.S.C. §§ 1956, 1957 (money laundering); and 21 U.S.C. §§ 841, 843, and 846 (drug trafficking, use of a communication facility, and conspiracy).

44. By reason of the above, the defendant assets are subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) as criminal proceeds.

## THIRD CLAIM FOR RELIEF
(21 U.S.C. § 881(a)(6))

45. Paragraphs one to thirty-two above are incorporated by reference as though fully set forth herein.

46. The defendant assets are subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6), because they were furnished and intended to be furnished in exchange for a controlled substance or listed chemical, constituted proceeds traceable to such an exchange, and were used and intended to be used to commit or facilitate a violation of 21 U.S.C. §§ 841, *et seq.*, an offense punishable by more than one year's imprisonment.

## PRAYER FOR RELIEF

WHEREFORE, the United States prays that:

1. Process issue according to the procedures of this Court in cases of actions *in rem;*

2. Any person having an interest in said defendant assets be given notice to file a claim and to answer the complaint;

3. This Court enter a judgment of forfeiture of the defendant assets to the United States; and,

4. The Court grant such other relief as may be proper.

DATED:  2/13/2019                                                       MCGREGOR W. SCOTT
                                                                                         United States Attorney


                                                                                         By: /s/ Kevin C. Khasigian
                                                                                              KEVIN C. KHASIGIAN
                                                                                              Assistant U.S. Attorney

# **VERIFICATION**

I, Jennifer Sanchez, hereby verify and declare under penalty of perjury that I am a Special Agent with the Drug Enforcement Administration, that I have read the foregoing Verified Complaint for Forfeiture *In Rem* and know the contents thereof, and that the matters contained in the *Amended* Verified Complaint are true to the best of my knowledge and belief.

The sources of my knowledge and belief are in the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent of the Drug Enforcement Administration.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Date: 2-12-19            /s/ Jennifer Sanchez
                         JENNIFER SANCHEZ
                         Special Agent
                         Drug Enforcement Administration

                         (Signature retained by attorney)